H. A. Ballenger, appellee, v. Otto Kahl et ux., appellants.

No. 48914.

(Reported in 76 N.W.2d 196)

722

April 4, 1956.

Cook & Drake, of Glenwood, for appellants.

Ross, Johnson, Northrop, Stuart & Tinley, of Council Bluffs, for appellee.

Oliver, J.—This case was tried upon a written stipulation of facts shown in the record, and an additional short stipulation, which is not set out.

Defendants occupied and farmed plaintiff's farm under a written lease for the term from March 1, 1953 to February 28, 1954. The lease, drawn upon a printed form, provided the second party (tenant) "covenants and agrees with the first party to pay, as rent for the same, in the manner following, that is to say: One half of all corn, shelled, * * *, all delivered to market free of cost to first party." The lease did not fix the time for the performance of this provision.

This lease was substantially the same as nine previous leases made by the parties, each for the term of one year, from March 1 to the following February 28, under which defendants had farmed this land since March 1, 1944. Counsel agree that sometime in 1953 defendants informed plaintiff they had purchased a farm and would not renew the lease for the year commencing March 1, 1954, and plaintiff thereafter caused to be served upon defendants the "written notice for termination" provided

by sections 562.6 and 562.7, Code of Iowa, 1954. Section 562.6 provides in part: "In the case of farm tenants * * * the tenancy shall continue for the following crop year upon the same terms and conditions as the original lease unless written notice for termination is given by either party to the other, whereupon the tenancy shall terminate March 1 following; * * * ." Section 562.7 requires that such written notice be served before November 1.

On or about February 28, 1954, the date fixed in the lease for its termination, defendants moved from the farm. One allegation in the answer to plaintiff's petition was, plaintiff refused to permit defendants to shell and deliver the corn during the period covered by the lease. However, this defense was not mentioned in the stipulation of facts, the record or the arguments. Apparently neither plaintiff nor defendants called attention to the provision of the lease requiring that the corn, paid as rent, be shelled and delivered to market.

Another circumstance not stipulated, but mentioned in argument, is that each year the corn was separated as it was picked and the landlord's share was placed in a separate corncrib on the farm. That practice had been continued in the fall of 1953, and when defendants vacated the farm February 28, 1954, plaintiff's corn was left there, in a crib: In each of the previous years, except 1950, the landlord's share of the corn had remained on the farm, apparently in a separate crib, until after the termination of the particular tenancy during which it was grown, and until defendants were notified it should be shelled and delivered to market.

The stipulation recites: "That corn grown on said premises during the calendar year 1944 was shelled and delivered to market on or about the 9th day of May, 1945, and at that time defendants paid the cost of shelling and delivering the corn to market." For the 1945 corn the delivery date was April 2, 1946; for the 1946 corn it was March 31, 1947; for the 1947 corn, July 6, 1948; for the 1948 corn, December 21, 1949; for the 1949 corn, November 1, 1950; for the 1950 corn, February 14, 1951; for the 1951 corn, October 23, 1952; for the 1952 corn, August 1, 1953. After setting out each of the foregoing delivery dates the stipu-

lation repeats, "and at that time defendants paid the cost of shelling and delivering said corn to market."

October 15, 1954, about seven and one-half months after the lease here in question terminated, plaintiff demanded that defendants shell and deliver to market the corn grown in 1953. Defendants refused. November 1, 1954, the corn was shelled and delivered to market at a cost of $178.14 paid by plaintiff. It is agreed this cost was reasonable. Action to recover it was instituted and tried to the court and judgment was rendered against defendants therefor. The trial judge certified the cause was one in which an appeal should be allowed. R. C. P. 333. Defendants have appealed.

I. The pleaded defense upon which this appeal is based, is, "That the leased premises have been surrendered by defendants and said surrender has been accepted by the plaintiff, and that the lease between the parties has been terminated and that no liability now exists on the part of the defendants to shell and deliver plaintiff's corn to market."

Predicated upon this is the only proposition relied upon for reversal, to wit: "The defendants' obligation to shell and deliver plaintiff's corn to market terminated when the tenancy between the parties terminated and the plaintiff accepted the defendants' surrender of possession, no demand to perform having been made by plaintiff for defendants to so perform until after the termination of the tenancy between them and until after plaintiff accepted the defendants' surrender of the leased premises."

Defendants' argument is based upon the incorrect assumption their leaving the farm at the termination of the lease was a "surrender" which freed them from liability under the lease. They cite text statements to the effect that the *surrender* of the leased premises by the tenant extinguishes the relation of landlord and tenant and ordinarily releases the tenant from liability for rent accruing thereafter. Although the word "surrender" has various meanings, depending upon the context, its meaning as here used is well established.

Beall v. White, 94 U.S. 382, 389, 24 L. Ed. 173, 176, states: "Text writers agree that a surrender is the yielding up

the estate to the landlord, so that the leasehold interest becomes extinct by mutual agreement between the parties. It is either in express words, by which the lessee manifests his intention of yielding up his interest in the premises, or by operation of law, when the parties without express surrender do some act which implies that they have both agreed to consider the surrender as made."

■ 32 Am. Jur., Landlord and Tenant, section 900, states: "A surrender may be either by agreement of the parties—the landlord and his tenant—or by operation of law. As implied in the definition of the term, surrender extinguishes all interest of the tenant in the term and consequently all rights conditioned upon its continuance."

Substantially the same definition appears in 51 C. J. S., Landlord and Tenant, section 120, page 711, which states also: " 'Surrender of a term' should be distinguished from 'surrender of possession', and 'surrender' distinguished from 'abandonment'."

Martin v. Stearns, 52 Iowa 345, 347, 3 N.W. 92, 93, states: "A surrender, as the term is used in the law of landlord and tenant, is the yielding up of the estate to the landlord so that the leasehold interest becomes extinct by mutual agreement between the parties." This case is cited and followed in Hickman v. Breadford, 179 Iowa 827, 832, 162 N.W. 53, and in Brown v. Cairns, 107 Iowa 727, 734, et seq., 77 N.W. 478.

Defendants cite Armour Packing Co. v. Des Moines Pork Co., 116 Iowa 723, 724, 89 N.W. 196, 93 Am. St. Rep. 270, and Kean v. Rogers, 146 Iowa 559, 563, 123 N.W. 754, 755. In each of these cases the tenancy was terminated before the expiration of the term. In the Armour case the landlord took over the meats and operated the meat market abandoned by the tenant. "This, without more, would constitute a surrender of the leasehold interest and an acceptance thereof." In Kean, the court states: "Where the landlord tells the tenant to quit, and he does so, and the lessor takes possession, there is an accepted surrender." Defendants say the other decision cited by them, American Bonding Co. v. Pueblo Inv. Co., 8 Cir., Colo., 150 F. 17, 9 L. R. A., N.S., 557, 567, is "the most similar case we have been able to find." There the lessees refused to continue to operate the hotel

on the premises and turned it over to the lessor in December 1904, nine and one-half months before the expiration of the lease. The lessor accepted it. The court held the tenant was not liable for taxes which would accrue and fall due in 1905. The decision states at page 30: "The termination of a lease during its term by surrender * *·* without more, discharges the lessee from liability for rents that have not accrued, but leaves him liable for all the rents which have accrued and become due, and for the performance of all covenants whose fulfillment is due."

██ ██ When the tenancy continues for the full term it is clear there can be no surrender, if for no other reason than that no part of the term remains upon which a surrender can take effect. In the case at bar defendants occupied the leased property for the full term of the written lease. However, they contend the information they gave plaintiff that they would not renew the lease and his "written notice for termination" under Code section 562.6 constituted a surrender by mutual agreement or by operation of law.

The record does not show any mutual agreement between the parties that the term be not extended. That the landlord considered it necessary to have the "notice for termination" served upon defendants tends to indicate he did not regard the information defendants would not renew the lease was legally effective to prevent its automatic continuation for another year and that he did not treat such information as an offer made him by defendants. Nor did the circumstance that the notice for termination was not objectionable to the tenants change the character of the instrument served upon them from a statutory notice for termination into an agreement between landlord and tenant.

Nor is there merit in the contention there was here a surrender by operation of law. As pointed out in Benschoter v. Hakes, 232 Iowa 1354, 1361, 8 N.W.2d 481, 485, the legislative intent in enacting the statute requiring written notice for termination, "was that farm leases for a definite term could be terminated only by the November 1st notice, and failure to give the notice worked a renewal of the lease for one year commencing he next March 1st." Rudolph v. Davis, 237 Iowa 1383, 1390, ΄5 N.W.2d 332, 336, quotes with approval, " 'Its purpose was imply to notify the tenant of the fact that the landlord did not

intend to renew the lease.' " Here the tenants left the premises at the expiration of their written lease, the extension of which was prevented by the "notice for termination." The burden was upon defendants to prove the surrender upon which their defense was based. It is clear no surrender was proven.

██ II. The shelling and delivery of the landlord's corn was part of the rent defendants agreed to pay for the term. Merrit v. Fisher, 19 Iowa 354, 357, states: "Now rent is a certain profit, either in money, provisions, chattels, or labor issuing out of *lands* and *tenements*, in retribution or return for their use."

It is stated in Secrest v. Stivers and Brown, 35 Iowa 580, 582, "The *labor* in gathering the corn was a part of the *rent* the tenants agreed to pay, * * *."

Brown v. Cairns, supra, 107 Iowa 727, 730, 77 N.W. 478, 479, states: "In short, nothing, as a general rule, will relieve him from his covenant to pay rent for the whole term, save an actual eviction, a surrender, or an abandonment for legal cause [citations]. Of course, the rent is not due, and cannot ordinarily be collected, until the time arrives for its payment. * * * It will not do to say that there was no debt because the time of payment had not yet arrived."

The written lease did not fix the time when defendants' obligation to shell and deliver the corn was to be performed. However, as already noted, in eight of the nine previous years in which defendants operated the farm under like leases, this was done after the expiration of the term of the lease during which the corn was produced. The conduct of the parties indicates they understood this obligation would be performed by defendants upon demand by plaintiff. There is no suggestion in the record the parties interpreted the language of the 1953 lease differently from that of the other leases. Hence, the interpretation placed by the parties upon the language in question affords no basis for any contention defendants' obligation to shell the corn and deliver it to market ceased with the termination of the lease.

██ Wilson v. Wilson, 220 Iowa 878, 882, 263 N.W. 830, 832, states: "It is well settled that in the absence of a contrary agreement, rental is neither earned nor payable until the ex-

piration of the term, or in any event rental is not due prior to the customary time of paying the same."

The trial court did not err in finding "that the termination of the lease on the 28th of February, 1954, and the delivery of the premises to plaintiff or another of his tenants, did not discharge the obligation to pay all of the 'rent reserved to be paid', as before set out, and upon a failure to pay the same upon demand, action could be brought therefor."

III. In oral argument, appellants stated it would work a hardship upon defendants to require them to return from their present abode to plaintiff's farm and perform their contract to shell the corn and haul it to market. A practical answer to this is the record shows it was defendants' practice to pay others to perform these services for them. The stipulation recites that each previous year "defendants paid the cost of shelling and delivering said corn to market." The judgment does not require them to do more than that.

█ Another suggestion made in oral argument was that defendants might have been called upon to carry out their agreement at any time within the statute of limitations. What, if any, legal objection would have resulted was not suggested. Their status is comparable to that of the maker of a promissory note, payable on demand. In any event, it does not appear the landlord's delay in disposing of his corn was unreasonable as compared with previous years.—Affirmed.

All JUSTICES concur.